FILED

OCT 1 2012

DAVID CREWS, CLERK

BY _____ Deputy

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## WESTERN DIVISION

SAMUEL CATALEN-BOYD, A MINOR
BY HIS NATURAL GUARDIAN, MOTHER
AND NEXT FRIEND, MANDI J. BOYD                                        **PLAINTIFF**

VS.                                        CIVIL ACTION NO.: _3:12CV88 SA SAA_

WILLIAM W. JOHNSON, M.D.,
THE CENTER FOR WOMEN'S HEALTH, P.L.L.C.,
BAPTIST MEMORIAL HOSPITAL-UNION COUNTY, INC.          **DEFENDANTS**

---

### COMPLAINT AND JURY DEMAND

---

COME NOW the Plaintiffs, Samuel Catalen-Boyd, a minor, by his natural guardian, mother and next friend, Mandi J. Boyd, by and through their attorneys, to show to the Court the following case:

### PARTIES AND JURISDICTION

1.     Samuel Catalen-Boyd is a minor and this case is brought by and through his natural guardian, mother and next friend, Mandi J. Boyd.

2.     Mandi J. Boyd and Samuel Catalen-Boyd are citizens and residents of Wildwood, Florida.

3.     William W. Johnson, M.D. is a licensed physician and specialist in the field of obstetrics and gynecology. Dr. Johnson is licensed by the state of Mississippi and does business within the State of Mississippi as a provider of obstetric and gynecological care. Dr. Johnson is a citizen and resident of the state of Mississippi.

4.     The Center for Women's Health, P.L.L.C is a professional limited liability corporation organized and existing under the laws of Mississippi. Defendant The Center for

Women's Health, P.L.L.C. has its principal place of business at 403 Doctors Drive, New Albany, Mississippi 38652.

5.     At all relevant times, Defendant Dr. Johnson was an employee or agent of The Center for Women's Health, P.L.L.C. and with respect to the acts alleged herein, acted within the scope of his employment of agency.

6.     Baptist Memorial Hospital-Union County, Inc. is a corporation, organized and existing under the laws of Mississippi.  Defendant Baptist Memorial Hospital-Union County owns or operates and does business as Baptist Memorial Hospital -Union County, a not-for-profit hospital.  Defendant Baptist Memorial Hospital-Union County, Inc. maintains its principal place of business at 200 Highway 30 West, New Albany Mississippi.

7.     Defendant Baptist Memorial Hospital-Union County, Inc. is a provider of in-patient obstetric services and employs labor and delivery nurses.  At all relevant times, the labor and delivery nurses caring for Mandi Boyd and her fetus, Samuel Catalen-Boyd, were acting within the scope of their employment or agency.

8.     This court has subject matter jurisdiction over this matter pursuant to 28 USC §1332 (diversity of citizenship).  The matter in controversy in this civil action exceeds $75,000.00, exclusive of costs and interest, as to each defendant, and is between citizens of different states.

9.     Venue is proper in this District under 28 USC §1391 because Defendants transact business within this district.

## FACTUAL ALLEGATIONS

10.     On February 9, 2006 Mandi Boyd was pregnant and presented for her first prenatal care visit with Defendant William Johnson, M.D. and Defendant The Center for Women's Health, P.L.L.C. This was Ms. Boyd's second pregnancy, her first ended in miscarriage.  On that visit a

sonogram was performed that found the fetus to have a gestational age of 6 weeks and 2 days. The estimated date of confinement, or due date, was calculated to be October 3, 2006.

11.     Throughout the pregnancy, Ms. Boyd maintained her prenatal care with Dr. Johnson and his practice. During that time she had multiple tests and sonograms performed, all of which showed that she was healthy and carrying a baby that was developing normally. According to Dr. Johnson's prenatal records, this was a low risk pregnancy.

12.     On October 9, 2006, at or about 0632, Dr. Johnson admitted Ms. Boyd to Defendant Baptist Memorial Hospital-Union County for induction of labor.

13.     On the date of admission, Ms. Boyd's fetus had a calculated gestational age of 40 weeks and six days. The indication, or medical reason, for the induction of labor was that she was past her due date.

14.     Upon her arrival and admission to Baptist Memorial Hospital-Union County Ms. Boyd came under that care of labor and delivery nurses, and others, who were employees or agents of the hospital.

15.     At the time of her admission, a cervical exam showed that Ms. Boyd was 1 cm dilated, 50% effaced, and her baby was in a cephalic presentation.

16.     At approximately 0715, Ms. Boyd was put on an electronic fetal monitor. An electronic fetal monitor is a device that records and prints the baby's heart rate and the mother's contractions during labor. This data is printed on continuous sheets of paper and is frequently stored electronically.

17.     Electronic fetal monitoring allows physicians and nurses to assess the well-being of the baby during labor and delivery. If signs of fetal intolerance of labor develop, the standard of care requires physicians and nurses to intervene before the baby is injured.

18.     At the time Ms. Boyd was placed on the electronic fetal monitor, the fetal heart rate was normal, accelerations were present, no decelerations were seen, and moderate variability was present. All of these features are reassuring; signs that the baby is doing well in utero at that time.

19.     At or about 0717 a Pitocin induction began. Pitocin, or Oxytocin, is a medication administered to induce contractions and cervical change. Pitocin carries a risk of hyperstimulation, or too frequent contractions, and fetal distress. The Pitocin in this induction was started at 2 mμ/min.

20.     The standard Oxytocin Orders at Baptist Memorial Hospital-Union County stated that Pitocin administration was not to exceed 20 mμ/min. The Orders in this case were signed by nurse Jacque Norton and Dr. William Johnson.

21.     At 0735, Dr. Johnson ruptured Ms. Boyd's membranes, a procedure known as artificial rupture of membranes. The amniotic fluid was described as clear and without odor, both of which are normal findings.

22.     At 0740, Ms. Boyd signed a consent for cesarean section, epidural and/or general anesthesia, pudendal and/or local anesthesia; and possible incidental appendectomy. At the same time, she signed a separate consent for vaginal delivery with possible repair and forcep use.

23.     At 0745, the nurses charted that Ms. Boyd was experiencing contractions every 2-4 minutes, the fetal heart rate was in a normal baseline range, there were 15 x 15 accelerations present, and no decelerations. All of these findings were normal and suggestive of a baby that was adequately oxygenated and tolerating labor.

24.     At 0750, Dr. Johnson's progress notes record that the baby had a reactive NST, or nonstress test. A reactive nonstress test is another indicator of fetal well-being.

25.     At 0823, nurse Jacque Norton described a deceleration of the fetal heart rate accompanied by a maternal complaint of an unusual pain and a very tight abdomen. Nurse Norton further noted that there was no apparent bleeding.

26.     These findings can be consistent with a placental abruption. A placental abruption occurs when the placenta prematurely separates from the uterine wall. A placental abruption can cause an interruption in the supply of oxygen to the baby and result in an obstetric emergency.

27.     In response, nurse Norton administered an IV fluid bolus, and turned off the Pitocin. An IV fluid bolus is an intrauterine resuscitative measure employed in an attempt to relieve the cause of fetal heart rate decelerations. She then notified Dr. Johnson.

28.     By 0900 the Pitocin had resumed at 2 m$\mu$/min and by 0915, the nurse increased it to 4.

29.     At 1234, a cervical exam found that Ms. Boyd was just 2cm dilated, 80% effaced, and the baby was at the -2 station.

30.     At 1240, nurse Norton increased the Pitocin to 25 m$\mu$/min, thereby exceeding the Pitocin Orders.

31.     Thereafter nurse Norton continued to increase the Pitocin well beyond the maximum permitted by the Pitocin Orders.

32.     By 1521, the Pitocin was infusing at 44 m$\mu$/min. At that time the fetal heart rate baseline was rising. Soon thereafter the fetal heart rate base was outside the upper limit of normal and was thus tachycardic.

33.     Fetal tachycardia can be a response to inadequate oxygenation possibly caused by, among other things, uterine hyperstimulation.

33. By 1550 and thereafter, the fetal heart rate baseline was tachycardic and there were decelerations with every, or nearly every contraction. Some of those decelerations were late decelerations, the most concerning type of fetal heart rate deceleration.

34. At 1637 a cervical exam found that Ms. Boyd was 6 cm dilated, 80% effaced, with the baby in the -2 station. She was still remote from delivery.

35. At 1704, nurse Amanda Bogan, who had assumed Ms. Boyd's care sometime after 1521, finally recorded the presence of fetal tachycardia and repetitive variable decelerations. She decreased the Pitocin to 20 mμ/min.

36. At or around 1726, nurse Bogan administered an IV bolus in an attempt to correct the fetal heart rate declerations.

37. At 1749, nurse Bogan administered another IV fluid bolus, reduced the Pitocin to 15 mμ/min, and notified Dr. Johnson.

38. Thereafter, despite reducing the Pitocin, position changes, IV boluses, and other attempts at intrauterine resuscitation, the fetal heart rate patterns remained tachycardic, continued to show repetitive decelerations, and diminished variability. All of these features, which had occurred throughout the day, are suggestive of a fetus that is not tolerating labor and may be at risk for injury.

39. At 1935 nurse Carmen Cartwright, who had apparently relieved nurse bogan, spoke with Dr. Johnson and informed him of the tachycardia, variable decelerations, and reduced fetal heart rate variability, all nonreassuring findings. Dr. Johnson ordered another fluid bolus, a measure that had already proven ineffective earlier, and did not come in to see his patients.

40. At 1939 nurse Cartwright began the IV bolus as ordered. Nevertheless, the nonreassuing fetal heart rate patterns persisted and became increasingly worrisome.

41. According to the records, at 1951, nurse Cartwright instructed Ms. Boyd to begin pushing with contractions even though her cervix was not completely dilated.

42.     According to the chart, Ms. Boyd's cervix reached complete dilatation at 2026.

43.     Samuel's fetal heart rate continued to have a baseline of 180 beats per minute with decelerations with every contraction.

44.     It was not until 2040 that Dr. Johnson arrived at Ms. Boyd's bedside. According to the chart, he arrived with forceps in hand, apparently anticipating the need for an expedited delivery.

45.     At 2045, Dr. Johnson attempted a forceps assisted delivery. Dr. Johson attempted a rotation at high station and delivery. This attempt was unsuccessful.

46.     At 2106 Ms. Boyd was taken to the operating room for a stat cesarean section.

47.     Samuel was delivered, belatedly, at 2114. At delivery, Samuel was not breathing, he was floppy, his heart rate was bradycardic, and he did not respond to stimuli. According to the pediatrician's note, at birth Samuel showed no signs of life whatsoever. He was quickly intubated with an endotracheal tube and bagged with 100% oxygen. According to the delivery records, a placental abruption was suspected.

48.     Samuel's Apgar scores, assessments of fetal well-being in the minutes just after birth measured on a scale of zero to ten, were 2 at one minute, 2 at five minutes, and 5 at five minutes. Samuel was born severely depressed due to the delay in his delivery.

49.     Samuel was transferred to the nursery and placed on a ventilator.

50.     Samuel's first arterial blood gas at 2149, showed a pH of less than 6.8. This was an extremely abnormal finding indicative of severe acidosis, a consequence of inadequate oxygen. The first arterial blood gas to report a base excess was at 2238. This blood gas found a base excess of -19.4, still indicative of severe metabolic acidosis, even after significant resuscitation.

51.     Samuel was subsequently transferred to North Mississippi Medical Center's neonatal intensive care unit (NICU). Samuel's diagnoses on admission included perinatal asphyxia and metabolic acidosis.

**52.** Within 12 hours after delivery Samuel exhibited signs of possible seizures and was started on Phenobarbital.

**53.** Laboratory tests of Samuel's liver and kidney function showed evidence of injury consistent with global hypoxia.

**54.** Blood cultures taken shortly after Samuel's delivery were ultimately negative and antibiotics were stopped as infection could be ruled out.

**55.** On October 16, 2006, Samuel underwent an MRI of the brain that revealed injuries consistent with a hypoxic-ischemic insult occurring around the time of birth.

**56.** Samuel was discharged on October 23, 2006.

**57.** Today, as a consequence of the delay in his delivery, Samuel suffers from severe and permanent brain injuries, cerebral palsy, developmental delays, disfigurement, and other serious and permanent injuries.

**58.** As a further result of his injuries, Samuel has suffered and will suffer, severe physical pain, emotional distress, lost or diminished earning capacity, dependence on others for all activities of daily living, and other harms and consequences.

**59.** Samuel's condition has required, and will continue to require, extensive and expensive medical, surgical, hospital, nursing, and custodial care, pharmaceuticals, equipment, transportation, housing, special education, and other forms of special needs, all of which would have been avoided had the Defendants not ignored the signs of his intolerance of labor and delivered him in a timely fashion.

**60.** Had Defendants adhered to the applicable standard of care, Mandi's labor and Samuel's heart rate patterns would have been properly evaluated and appropriate measures would have been taken deliver him promptly in order to avoid the injuries and damages that Samuel sustained.

## ENTITIES AND LEGAL DUTIES

**61.**     Plaintiff repeats and realleges paragraphs 1-60 as if set forth full herein.

**62.**     Defendants, each of them, directly and through their actual and/or apparent/ostensible agents, servants, and/or employees, owed a duty to Plaintiff to exercise that degree of reasonable care and skill exercised by like health care professionals of good standing under similar circumstances.

**63.**     Baptist Memorial Hospital-Union County, Inc. is liable for the acts and omissions of its nurses and other health care providers, during their care and treatment of Mandi Boyd and her fetus, under the doctrine of *respondeat superior* and apparent agency.

**64.**     The Center for Women's Health, P.L.L.C. is liable for the acts and omission of its employee and/or agent William Johnson, M.D.

**65.**     William Johnson, M.D. is personally liable for his acts and omissions as alleged above.

**66.**     Contrary to the aforesaid duties owed by the Defendants, jointly and severally, the Defendants were negligent in their diagnosis, care, monitoring, response, and treatment of Mandi Boyd and her fetus, and such negligence was the proximate cause of the injuries and damages sustained and sued for in this action.

**67.**     Baptist Memorial Hospital-Union County, Inc., by and through the acts of the labor and delivery nurses who cared for Mandi Boyd and Samuel Catelen-Boyd, was negligent, careless, reckless, and deviated from acceptable standards of care in the following particulars:

        **a)**     by failing to properly monitor Mandi Boyd's labor;

        **b)**     by failing to properly communicate with the obstetrician;

        **c)**     by failing to properly interpret the fetal heart rate tracings;

        **d)**     by failing to appropriately respond to nonreassuring fetal heart rate patterns;

     **e)**     by misusing Pitocin in this labor;

     **f)**     by failing to alert Dr. Johnson, or another physician, of the need for intervention to prevent injury to the fetus.

     **g)**     by failing to invoke the chain of command in order to ensure Samuel's timely delivery;

     **h)**     in such other ways as the evidence obtained in discovery may show.

**68.**     The Center for Women's Health, P.L.L.C. and Dr. William Johnson were negligent, careless, reckless, and deviated from acceptable standards of care in the following particulars:

     **a)**     by failing to properly monitor Mandi Boyd's labor;

     **b)**     by failing to supervise and properly communicate with the labor and delivery nurses;

     **c)**     by failing to properly interpret the fetal heart rate tracings;

     **d)**     by failing to appropriately respond to nonreassuring fetal heart rate patterns;

     **e)**     by misusing Pitocin in this labor;

     **f)**     by failing to deliver Samuel in time to avoid injury;

     **g)**     in such other ways as the evidence obtained in discovery may show.

## DAMAGES

**69.**     As a direct and proximate result of the aforesaid negligence of the Defendants as alleged herein, jointly and severally, the infant Plaintiff Samuel Catalen-Boyd was caused to suffer a traumatic delivery, and to sustain severe, painful, permanent and disabling injuries, including, but not limited to:

     **a)**     cerebral palsy, permanent and irreversible neurological injury;

     **b)**     cognitive and motor dysfunction;

     **c)**     speech and language difficulties;

     **d)**     pain and mental anguish;

     **e)**     diminished enjoyment and quality of life;

      **f)**     seizure disorder; and

      **g)**     loss of earnings and diminished earning capacity.

**70.**    As a further direct and proximate result of the aforesaid negligence of the Defendants, who are joint tortfeasors, Samuel Catalen-Boyd has required and will continue to require substantial medical, nursing, and related care; various types of therapies, such as physical, occupational, speech, rehabilitation, psychological and pharmaceutical; and other care including specialized devices, equipment, transportation and housing for which significant sums of money are being, have been, and will continue to be expended in the future.

**71.**    Samuel Catalen-Boyd, a minor, by his mother and next friend, Mandi J. Boyd, sues for injuries to the person of Samuel Catalen-Boyd, including his horrific pain and suffering, past, present, and future, general and special damages, including all damages alleged herein and which are otherwise allowed by law.

**72.**    Had the Defendants complied with the applicable standard of care in this case, the injuries and damages complained of would have been avoided.

## JURY DEMAND

**73.**    Pursuant to Rule 58(b), Fed. R.Civ.P., Plaintiff demands a trial by jury on all issues.

### Attorney's Certification (Miss. Code §11-1-58)

**74.**    The undersigned attorneys have reviewed the facts of the case and consulted with at least one expert qualified pursuant to the Mississippi Rules of Civil Procedure and Mississippi Rules of Evidence who is qualified to give testimony as to standard of care or negligence and who the attorneys reasonably believe is knowledgeable in the relevant issues involved in the action.

**75.**    On the basis of that review and consultation the undersigned attorneys have concluded that there is a reasonable basis for the commencement of this action.

**WHEREFORE**, Plaintiff demands judgment against the defendants for a sum in excess of Seventy Five Thousand Dollars ($75,000.00) for the injuries and damages alleged herein and request that he be compensated with a fair, adequate, and just award, plus costs.

Respectfully submitted,

William M. Quin II (MS Bar No. 10834)
**MCCRANEY, MONTAGNET, QUIN PLLC**
602 Steed Rd., Suite 200
Ridgeland, MS 39157
Telephone:     (601) 707-5725
Facsimile:      (601) 510-2939
wquin@mmqlaw.com

**Of Counsel:**

Kenneth M. Suggs (Fed ID No. 3422)
Gerald D. Jowers, Jr. (Fed ID No. 8025)
Janet, Jenner & Suggs, LLC
500 Taylor St., Suite 301
Columbia, SC 29201
Telephone:     (803) 726-0050
Facsimile:      (803) 727-1059